UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ADAM TAYLOR,
    *Plaintiff*,

v.

ABHILASH PILLAI *et al.*,
    *Defendants*.

No. 3:21-cv-623 (JAM)

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This case arises from the shooting of a suspect who was fleeing from the police in his car. After the police shot him, the suspect kept driving until he lost consciousness and was then apprehended by the police and removed from his car.

The plaintiff principally claims that the police used excessive force not only by shooting him but also in the course of removing him from his car. For the reasons stated below, I will grant the police officers' motions for summary judgment.

BACKGROUND

The plaintiff Adam Taylor has filed this action against three officers of the Hartford Police Department (Abhilash Pillai, Christopher Reeder, and Jeffrey Moody) and a federal DEA Task Force Officer (Jeffrey Poulin). The facts of this case arise from a law enforcement surveillance operation in the Asylum Hill area of Hartford, Connecticut.[1] On May 16, 2018, the law enforcement officers decided to arrest Taylor after witnessing him sell crack cocaine and heroin.[2] The officers, including Poulin, followed Taylor by car when he drove away from the site

---
[1] Doc. #88-6 at 2 (¶ 3).
[2] *Id.* at 2 (¶¶ 2–4).

1

of the narcotics sale at approximately 11:53 am.[3] While in pursuit, Poulin was informed that Taylor was known to police as a "runner" that fled arrest.[4]

Officers converged on Taylor's car at a stoplight when his car was boxed in by civilian cars in front, police cars on the driver's side, and a sidewalk on the passenger's side.[5] Although "roughly six" officers surrounded Taylor's car on foot and were "yelling commands for Taylor to stop and surrender to arrest," he drove onto the public sidewalk and along a metal fence.[6]

Finding his path blocked by a fire hydrant, Taylor put his car in reverse and began to perform a "K" turn so that the back of his car reversed into the street.[7] Officers surrounded Taylor's car during this maneuver, but he claims he could not discern the commands they were yelling.[8] During the course of the turn, the front passenger corner of Taylor's car moved along the metal fence and forced a Hartford police officer (Robert Frogg) to jump over the car's hood to avoid being pinned.[9] Poulin heard one or more officers yell, in reference to Frogg, that an officer had been hit.[10]

While Taylor was executing the turn, Poulin positioned himself in a grassy area around the fence, adjacent to a tree.[11] Poulin was aware of other officers positioned near him, as well as civilians in the general area, such as those in cars at the traffic light.[12]

Upon completing the turn, Taylor put his car in drive.[13] His car was approximately two to three car lengths away from Poulin and positioned so that Taylor could see Poulin straight out of

---

[3] *Id.* at 2–3 (¶¶ 4–5).
[4] *Id.* at 3 (¶ 5).
[5] *Id.* at 3 (¶¶ 6–7).
[6] *Id.* at 3–4 (¶¶ 7, 9).
[7] *Id.* at 4 (¶¶ 10–11); Doc. #88-5 at 2 (¶ 7).
[8] Doc. #88-6 at 4 (¶ 12).
[9] *Id.* at 5 (¶ 13).
[10] *Id.* at 5 (¶ 14).
[11] *Id.* at 5 (¶ 15).
[12] *Id.* at 5–6 (¶ 16).
[13] *Id.* at 6 (¶ 17).

the front of his windshield.[14] Taylor saw Poulin but "was thinking nothing of it, I'm thinking he's going to shoot a tire or something so I just keep driving. And I'm driving and just boom, boom, that's when I just got shot."[15] Poulin discharged his firearm and Taylor was struck by a bullet.[16] A state police investigation after the shooting determined that Taylor's car "struck the tree trunk that Officer Poulin was standing next to" and that if "the tree trunk had not been there to stop the [car], the [car] would have struck Officer Poulin."[17]

After the shooting, Taylor drove onto the street but lost consciousness after several turns and came to a stop.[18] When Moody approached Taylor's car, he was only able to access the car through the right rear passenger door.[19] Although Moody issued commands to "show me your hands," Taylor was unresponsive, and Moody could not see either of his hands.[20] Moody then entered the rear passenger compartment of the car, gained control of Taylor's arms, and handcuffed one of his hands.[21] Moody grabbed Taylor's arms, took him out of the car, put him on the ground, and handcuffed his other hand.[22]

The parties disagree about whether Poulin excessively "slammed" Taylor to the ground or whether Poulin properly "placed" Taylor to the ground.[23] Only after he was put on the ground did Taylor briefly regain consciousness when he was later being lifted from the ground into an ambulance.[24]

---

[14] *Id.* at 6 (¶ 17), 8–9 (¶ 26).
[15] *Id.* at 7 (¶ 22). While Poulin puts forth testimony from several officers that Taylor accelerated towards Poulin when the shots were fired, Taylor does not admit those facts; rather, he admits only that the individuals testified as such. *See id.* at 6–7 (¶¶ 18–21). Because summary judgment requires that I consider the facts in the light most favorable to the plaintiff, I have not considered the officers' testimony as part of this ruling.
[16] Doc. #88-5 at 2 (¶ 9); *see* Doc. #88-6 at 8 (¶ 24).
[17] Doc. #88-6 at 8 (¶ 25).
[18] *Id.* at 9 (¶ 27); Doc. #88-5 at 3–4 (¶¶ 13, 15).
[19] Doc. #88-5 at 4–5 (¶¶ 18–20).
[20] *Id.* at 5 (¶¶ 21–22).
[21] *Id.* at 5–6 (¶¶ 23–25).
[22] *Id.* at 6–7 (¶¶ 26–27, 30).
[23] *Id.* at 6–7 (¶¶ 26, 30).
[24] *Id.* at 6 (¶ 28); Doc. #88-1 at 89.

Reeder never exerted any force on Taylor.[25] And Pillai was not personally involved in Taylor's arrest on May 16, 2018.[26]

Taylor was arrested and pled guilty to charges including sale of a narcotic substance, possession of a controlled substance, and illegal operation of a motor vehicle.[27] He entered an *Alford* plea to charges that included two counts of reckless endangerment in the first degree.[28]

Taylor filed this lawsuit, asserting claims for unconstitutional excessive force, assault and battery, recklessness, and malicious prosecution.[29] The defendants have filed motions for summary judgment.[30]

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[31]

---

[25] Doc. #88-5 at 7 (¶ 31).
[26] *Id.* at 9 (¶ 39).
[27] *Id.* at 8 (¶ 36); *see Connecticut v. Taylor*, HHD-CR18-0696417-T (Conn. Super. Ct. 2020); *Connecticut v. Taylor*, HHD-MV18-0512321-T (Conn. Super. Ct. 2020).
[28] Doc. #88-5 at 8 (¶ 36).
[29] Doc. #1; Doc. #40 at 4–6.
[30] Doc. #83 (Pillai, Reeder, and Moody); Doc. #84 (Poulin).
[31] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

4

*Pillai and Reeder*

Pillai and Reeder have moved for summary judgment on all claims against them.[32] Taylor "concedes that summary judgment can be granted against Pillai and Reeder."[33] Accordingly, I will grant summary judgment as to Pillai and Reeder.

*Moody*

Moody has moved for summary judgment on all claims against him.[34] At oral argument, counsel for Moody and Taylor agreed that summary judgment could be granted in Moody's favor as to the recklessness claim, so that the only remaining claims against Moody are for unconstitutional excessive force pursuant to 42 U.S.C. § 1983 and for state law assault and battery.

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Because the Fourth Amendment protects against unreasonable seizures, it has long been recognized that the Fourth Amendment is violated if the police use excessive force against a non-sentenced person for the purpose of arresting or restraining his or her freedom of movement. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386 (1989).

As the Supreme Court has explained, whether police officers' use of force is "excessive" must be judged by "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"

---

[32] Doc. #83-1 at 2–17.
[33] Doc. #88 at 10. Because Taylor did not allege a claim for malicious prosecution against Poulin or Moody, this concession eliminates the malicious prosecution claim from this case.
[34] Doc. #83-1 at 12–17.

and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

To defeat summary judgment as to the excessive force claim against Moody, "[Taylor] was required to proffer admissible evidence that sets forth specific facts showing a genuinely disputed factual issue that is material under the applicable legal principles." *Henvill v. Metro. Transp. Auth.*, 2023 WL 7294702, at *1 (2d Cir. 2023). Taylor relies on two pieces of evidence to support his claim that Moody "slammed," rather than "placed," him on the ground.[35]

First, he points to his testimony that he was "slammed" onto the ground by Moody.[36] But Taylor does not dispute that he lost consciousness while driving and only briefly regained consciousness *after* he was removed from the car and placed on the ground by Moody, and that he did not regain consciousness except for a few seconds when he was later lifted from the ground into an ambulance.[37] Taylor testified that he was unconscious when he was removed from the car and put on the ground.[38] While a plaintiff's testimony is generally sufficient at summary judgment, it can be discounted if the testimony is "incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed." *Ortega v. Moran*, 2022 WL 17092584, at *4 (D. Conn. 2022) (quoting *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019)). Here, because it is undisputed that Taylor was unconscious at the time in question,

---

[35] Doc. #88 at 10; Doc. #88-5 at 6–7 (¶¶ 26, 30).
[36] *See* Doc. #88-2 at 18–19; *see also* Doc. #88-1 at 58.
[37] *See* Doc. #88-5 at 3 (¶ 13), 6 (¶ 28); Doc. #88-1 at 89 (Taylor deposition testimony that "when they were grabbing me on the floor and handling me up and throwing me into the ambulance I was up for a few seconds until they hooked the IV up to me" and "[a]ll I recall is the few seconds from there to the ambulance, that's it" and "[f]rom the floor to the ambulance that's all I remember").
[38] *See, e.g.*, Doc. #88-1 at 58 ("This driver pulled out a cell phone and seen officer friendly get real friendly taking me out of the car and slamming me on the floor while I was unconscious. Like I was out cold."); Doc. #88-2 at 19 ("While I was unconscious, they picked me up and threw me on the floor.").

his testimony that he was "slammed" to the ground, rather than "placed" on the ground, is not enough to withstand summary judgment.

Taylor alternatively claims that a video clearly shows Moody slam him on the ground.[39] Taylor's counsel represented at oral argument that the video was a recording of a television broadcast made by Taylor's mother on her cell phone. But Taylor did not obtain the original footage, nor did he authenticate the video. *See Soto v. City of New York*, 2017 WL 892338, at *1 (S.D.N.Y. 2017) (noting "that videos are not self-authenticating and therefore require authentication testimony"). And although Taylor referenced a recording during his deposition, Moody's counsel represented that the video in question was never introduced as a deposition exhibit or identified as the recording Taylor referenced in his testimony.[40] Accordingly, because "[i]t is appropriate for a district court ruling on summary judgment to *consider only admissible evidence*," I will not consider this video in my ruling. *Henvill*, 2023 WL 7294702, at *1 (emphasis added). Moreover, even if the video was admitted, I conclude from a review of the video snippet submitted by counsel that it is at best inconclusive and does not create a genuine issue of fact to carry Taylor's burden to show that Moody used excessive force.

As to Taylor's assault-and-battery claim, "[t]he essential elements of a Fourth Amendment excessive-force claim and a state-law assault-and-battery claim are substantially identical." *Outlaw v. City of Hartford*, 2015 WL 13646918, at *1 (D. Conn. 2015) (citing *Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991)). Therefore, because Taylor's Fourth Amendment claim fails, so too does his assault-and-battery claim.

Viewing the facts as I must in the light most favorable to Taylor, I conclude that there is no genuine fact issue to support Taylor's claim that Moody used excessive force or engaged in

---

[39] Doc. #88 at 10; Doc. #88-3.
[40] *See* Doc. #88-1 at 57–59.

7

an assault and battery in removing Taylor from the car. Accordingly, I will grant Moody's motion for summary judgment as to both claims.

### *Poulin*

Poulin has moved for summary judgment on Taylor's claim for unconstitutional excessive force pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)—the sole claim against him.[41] Poulin advances several bases for summary judgment, including qualified immunity.[42]

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In this manner, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014).

Qualified immunity protects a police officer from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79

---

[41] Doc. #84 at 2.
[42] District courts have discretion in whether to first address the alleged constitutional violation or the application of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009). Accordingly, I will first address the application of qualified immunity.

(2014). Thus, an official is entitled to qualified immunity if, on the basis of the facts known to the official when he or she engaged in the conduct at issue, "officers of reasonable competence could disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010).

The Second Circuit has advised that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if the decisions of the Supreme Court or the "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018).

The qualified immunity doctrine is doubtlessly most easily applied when one side or the other can cite a prior case with virtually identical facts. But there need not necessarily be a case right on point, because "officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances, and there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018).

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court issued a landmark ruling to clarify the constitutional standard that should govern the police when choosing whether to use deadly force against a fleeing suspect. At the outset, the Supreme Court observed that "[t]he use

9

of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable," because "[i]t is not better that all felony suspects die than that they escape." *Id.* at 11. Instead, the Court held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Ibid.* Put differently, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Ibid.*

From this ruling, the Supreme Court announced the following standard to govern whether a police officer may resort to the use of deadly force against a fleeing suspect: "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Ibid.* The Second Circuit has likewise announced and followed this same standard: "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003); *see Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (same). Moreover, in the qualified immunity context, if the substantive Fourth Amendment standard requires a determination of probable cause, a police officer is entitled to qualified immunity so long as there is even arguable probable cause. *See, e.g.*, *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016).

Although the *Garner* rule is itself a constitutional sub-rule of the more general rule that a police officer may not use objectively unreasonable force, the Supreme Court has cautioned that—absent a so-called "obvious case"—the *Garner* rule may be too general a guide for whether an officer's use of force violated clearly established law. *See Kisela v. Hughes*, 584 U.S.

10

100, 105 (2018) (*per curiam*) (noting that "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case"); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (same).

I will therefore consider whether an objectively reasonable police officer would have known in May 2018 that the Constitution does not permit him to shoot a fleeing suspect driving erratically in the vicinity of police officers and civilians as Taylor was doing here. Consider the facts of *Brosseau v. Haugen*, where an officer shot a fleeing motorist as the car had just "started or shortly after it began to move." 543 U.S. at 196. The Supreme Court found that the officer did not violate clearly established law because she feared that the fleeing suspect posed a danger to "'other officers on foot who [she] *believed* were in the immediate area,' 'the occupied vehicles in [his] path,' and 'any other citizens who *might* be in the area.'" *Mullenix*, 577 U.S. at 14 (quoting *Brosseau*, 543 U.S. at 197). Here, Poulin fired his weapon only after Taylor had already decided to flee by driving on the sidewalk and then had turned his car around in a position not far from Poulin where he could see "Poulin straight out of the front of his windshield."[43] Moreover, Poulin *knew* that officers and civilians were in the immediate area and had heard that an officer had already been hit by Taylor's car.

Similarly, the Supreme Court found the use of deadly force in *Plumhoff v. Rickard* was reasonable even though the shooting occurred when the suspect's car was at a "near standstill," because "all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight" such that he would "pose a deadly threat for others." 572 U.S. at 776–77. And in *O'Brien v. Barrows*, 556 F. App'x 2 (2d Cir. 2014), the Second Circuit affirmed a grant of qualified immunity for an officer who shot "the subject of an erratic driving report"

---

[43] Doc. #88-6 at 6 (¶ 17).

when he "slammed on the gas and t[ook] off" "towards a busy road." *O'Brien v. Barrows*, 2013 WL 486655, at *7 (D. Vt. 2013); *see also O'Brien*, 556 F. App'x at 4 (affirming judgment "for substantially the reasons stated by the district court"). Here, as in *Plumhoff* and *O'Brien*, Taylor had already attempted to flee by driving onto a sidewalk, putting police officers and civilians at risk. Moreover, his car was in drive and he was going to "just keep driving" up until he was shot.

In sum, "the Supreme Court and Second Circuit have, on multiple occasions, afforded qualified immunity to an officer who employed deadly force against a motorist who was driving erratically in a crowded area in an effort to evade arrest." *Martinez v. Hasper*, 2022 WL 130506, at *4 (E.D.N.Y. 2022), *aff'd in part*, *vacated in part*, *and remanded*, 2023 WL 4417355 (2d Cir. 2023). Those cases are not materially distinguishable from the facts here.

Taylor argues that *Cowan* forecloses a grant of qualified immunity, but his reliance is misplaced.[44] In *Cowan*, a fleeing motorist who was "traveling slowly" and "made no sudden turns" was fatally shot by an officer who "was not in front of the vehicle but substantially off to its side." *Cowan*, 352 F.3d at 763. The Second Circuit affirmed a denial of qualified immunity since the officer only fired the second, fatal shot "because he was trained always to fire twice" and not "because he believed he was in danger." *Ibid. Cowan* is therefore limited to holding that "an officer should not shoot at a fleeing motorist *who poses no apparent threat to the officer or others*." *O'Brien*, 556 F. App'x at 4 (emphasis added); *see O'Brien*, 2013 WL 486655, at *8 ("Flight, without more, is insufficient to support the use of deadly force. Yet [Defendant] had

---

[44] Taylor also invokes *Thevenin v. French*, 850 F. App'x 32 (2d Cir. 2021), which relied on *Cowan* in denying qualified immunity. But *Thevenin* is inapplicable here. "[T]he critical fact that allowed qualified immunity to attach to the use of deadly force by police officers [in cases including *Brosseau* and *Plumhoff*] was the presence of a significant threat of death or serious physical injury to either the defendant, other officers, or civilian bystanders," which, while present here, was "completely absent" from *Thevenin*. *Id.* at 37. Other cases relied on by Taylor were "filled with disputes as to material facts" and thus unripe for disposition on summary judgment. *Scism v. Ferris*, 2022 WL 289314, at *2 (D. Conn. 2022); *see Marrero for Estate of Morales v. Cote*, 756 F. App'x 79, 80 (2d Cir. 2019); *O'Bert*, 331 F.3d at 35, 40. Such is not the case here.

reason to believe the Plaintiff posed a threat to other drivers, as well as himself. *Cowan* does not make the unlawfulness of his conduct apparent.").

The uncontested facts here diverge drastically from those in *Cowan*. Poulin knew that Taylor was a "runner." Taylor, surrounded by officers on foot, police cars, and civilian cars, drove onto a public sidewalk and pinned a Hartford police officer against a metal fence while attempting to flee. Poulin heard that Taylor had hit an officer. And just before the shooting, "Taylor could see Officer Poulin straight out of the front of his windshield" but "just ke[pt] driving."[45] The uncontested facts clearly show that an objectively reasonable law enforcement officer could have believed that Taylor posed an apparent threat to officers, civilians, and Poulin himself, such that the use of deadly force by Poulin was reasonable.

Nor does it matter that Taylor contends "he never put any officer in danger."[46] Taylor himself recognized that he was in a position in which an officer may shoot at him but "thought they were going to shoot a tire out, a wheel, something."[47] And the uncontested facts plainly show, as discussed above, that Poulin had *at least* arguable probable cause to believe that Taylor's flight posed a significant threat of death or serious physical injury.

In short, when viewing the facts in the light most favorable to Taylor, I conclude that they compel a grant of qualified immunity. Because qualified immunity provides a sufficient basis on which to grant Poulin's motion, I need not address his other arguments for summary judgment.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motions for summary judgment (Docs. #83, #84). The Clerk of Court shall close this case.

---

[45] Doc. #88-6 at 6–7 (¶¶ 17, 22).
[46] Doc. #88 at 9.
[47] Doc. #88-6 at 7 (¶ 22).

13

It is so ordered.

Dated at New Haven this 11th day of March 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge